**INTERMETAL MEXICANA, S.A.**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Appellant.**

**No. 88–1575.**

United States Court of Appeals, Third Circuit.

Argued Dec. 1, 1988.

Decided Jan. 18, 1989.

Rehearing Denied March 8, 1989.

Stephen A. Cozen (argued), Richard C. Bennett, Cozen and O'Connor, Philadelphia, Pa., for appellant.

Alfred W. Putnam, Jr. (argued), Gary R. Battistoni, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.

Before SEITZ, STAPLETON and COWEN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises from an order of the district court denying defendant's post-trial motions for Judgment Notwithstanding the Verdict, a New Trial, and/or an Order Molding, Amending or Modifying the Judgment. The district court had entered a judgment on September 10, 1987 which directed the defendant to pay the plaintiff the sum of $3,649,309.77 under the terms of the insurance policy at issue. Upon review, we conclude that the district court erred in its construction of the policy and will reverse and remand.

### I.

The underlying dispute in this case raises the question of whether the plaintiff, Intermetal Mexicana, S.A. ("IMSA"), an affiliate of International Mill Service, Inc. ("IMS"),[1] has a valid claim for payment from the defendant Insurance Company of North America ("INA") for the value of machinery that INA insured. IMSA brought suit against INA in the Eastern District of Pennsylvania on December 1, 1984, seeking to recover the replacement cost of eleven pieces of equipment. This is a diversity action in which Pennsylvania law applies. This Court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

On March 20, 1982, IMS and INA entered into a written insurance contract entitled "Contractors Machinery and Equipment Floater Policy No. 70HF228" ("the policy"). App. at 1159aa. The policy covers "all risks of direct physical loss or damage from any external cause except hereinafter excluded." App. at 1159ee. The policy also provides that the insurer's duty to indemnify applies to "items ... entered in the Schedule, whilst at a location or in transit thereto or therefrom within the territorial limits of the policy" in the event such items "suffer any unforeseen and sudden physical loss or damage from any cause, other than those specifically excluded...." App. at 1159cc. The parties agree that the insurance policy covers the IMSA equipment at issue here.

The equipment which was the subject of the underlying dispute is titled to IMSA. IMSA is a Mexican corporation that is jointly owned—sixty percent of the stock being owned by IU Corporation, Inc. ("IU")[2] and forty percent being owned by a Mexican national named Raoul Martinez. Martinez was a director of IMSA during this period and he apparently exercises control over a separate construction-equipment dealership, Ter–Mexicana, S.A. ("Ter–Mexicana").[3] According to IMSA, Martinez functioned as a "sleeping partner," i.e., he did not act for or participate in the operations of IMSA. App. at 288–89, 319.

IMSA began to lose money in the late 1970's. IU and Martinez, the shareholders of IMSA, agreed to loan IMSA $600,000. Martinez assumed forty percent of the responsibility for the loan ($240,000) and IU, sixty percent ($360,000)—reflecting the proportion of their equity ownership. Martinez then persuaded Ter–Mexicana to loan IMSA the $240,000. App. at 124. The loan

---

**1.** IMS provides steel slag removal and processing services to steel mills located around the world. Through subsidiaries and affiliates, IMS operates in more than fifteen countries. IMSA is a separate corporation and is the IMS affiliate that operated in Mexico. IMS is not a party to this action.

**2.** IU wholly owns the named insured, IMS. The policy defines "insured" to include IMS and any

of its affiliates. Since IMSA is an affiliate of IMS, it is covered under the policy.

**3.** The district court found no evidence of ownership of Ter–Mexicana in the record. App. at 1802 n. 1. The record does reveal, however, that Martinez's son-in-law and attorney, Daniel Calvert Ramirez, is the General Manager of Ter–Mexicana and that Martinez had substantial influence over the company's affairs.

was not secured by IMSA's equipment or by any other collateral. App. at 129, 325.

At the time the policy was issued, the insured equipment was located at Altos Hornos Steel Mill ("AHMSA") in Montclova, Mexico. In June or July, 1982, a decision was made to cease operations at the two IMSA sites in Mexico—Sicartsa and AHMSA in Montclova—as the result of deteriorating business conditions. Late in 1982, IMSA moved the equipment in Montclova to a storage location known as Frontera in Coahuila, Mexico. On September 23, 1983, INA was informed that the eleven pieces of equipment at issue had been moved from the AHMSA site to a non-scheduled uninsured location under the policy as it was then written, and that IMSA wished to secure an endorsement in order to provide coverage at the new location. App. at 826. INA was also advised that the equipment was being held by the Mexican partner, Martinez. INA subsequently issued Endorsement No. 11.

On July 15, 1983, Martinez and Ter–Mexicana obtained a court order *ex parte* and without notice to IMSA entitling Martinez and Ter–Mexicana to obtain possession of the eleven pieces of insured equipment which had been moved to Frontera.[4] On July 16, 1983, representatives of Ter–Mexicana went to Frontera, took possession of the equipment pursuant to the court order and removed it to a fenced-in lot under Ter–Mexicana's control. Apparently, this was a strategy by which Martinez sought to induce repayment of the $240,000 loan which IMSA owed him.

IMSA's Mexican counsel promptly commenced legal action to recover the equipment. App. at 566. On November 25, 1983, IMSA obtained a court order directing Ter–Mexicana to return the equipment to IMSA. When the IMSA representatives arrived on November 25 to retrieve the equipment, employees of Martinez and Ter–Mexicana refused to admit them, threatening them with physical violence. The employees then immobilized the equipment by partially dismantling it. IMSA's representatives, although legally entitled at the time to the return of the equipment, were forced to retreat. IMS sent INA a Sworn Proof of Loss Statement on May 18, 1984. On that same day, INA mailed a reservation of rights letter to IMS. INA denied the IMS claim of theft under the policy and this litigation ensued.

The case was tried by a jury in June, 1987. At the conclusion of the trial, the jury was charged that July 16, 1983 was the date of the loss.[5] Because the district court held that the loss occurred on July 16, 1983 as opposed to November 25, 1983, it found that it was unnecessary to reach the issue of whether IMSA misrepresented facts in the interim period when it secured the endorsement.[6] Finally, the district

---

4. The Mexican court order of July 15, 1983 was a valid order which the parties were required to obey even though it was later overruled. Jorge Leon Orantes Vallejo, a Mexican legal expert, testified that the order was valid. The testimony was as follows:

> Q. Senor Orantes, under the commercial action, was the attachment which went into effect in July, mid-July of 1983, continually valid until that Court of Appeals' decision in July of 1984?
> A. Yes, because the attachment was placed in accordance with a legal order, valid until the Court of Appeals' judgment was revoked.

App. at 716.

5. During the charging conference, the district court explained that:

> [The equipment] went out of IMSA's control as of July 16th. IMSA obviously hoped that it would be retrievable, they knew where it was. They took litigation steps to recover it. November came along and it became rather

more emphatically obvious that Martinez was going to violate the law, to hold onto the equipment. So, I think, the loss in terms of the departure from IMSA's custody matured as of July 16th.

App. at 893–94.

6. The district court stated:

> As it was, however, the jury made no finding as to whether IMSA made material misrepresentations in obtaining the endorsement, because the endorsement was irrelevant to the outcome of the case. The validity of endorsement number 11 would only have been relevant if the loss had occurred after the endorsement were obtained, and if coverage for such loss was contingent on the validity of the endorsement. Given my conclusion that the loss occurred on July 16, 1983—a conclusion which I continue to adhere to for the reasons stated in section II, above—the endorsement obtained on September 1, 1983 does not affect coverage for that loss.

court found no evidence that Martinez or Ter–Mexicana would share in any recovery IMSA made from INA and consequently held against INA on its equitable claim that IMSA's damages must be reduced by forty percent. App. at 1827–28. The court then entered judgment for IMSA for the scheduled value of the insured equipment, plus pre-judgment interest. App. at 1797. On June 29, 1988, the district court issued an Opinion and Order rejecting each of INA's post-trial motions. INA now appeals.

## II.

INA first argues on this appeal that the district court erred in failing to hold the loss not "fortuitous" as a matter of law and second, that the court erred in not finding that the "earliest possible date of [any] loss [under the policy] is November 25." Appellant's Brief at 26. Third, INA contends that the district court erred in taking from the jury the issue of misrepresentation in connection with the procurement of Endorsement No. 11.[7] Finally, INA contends that any verdict in favor of IMSA should have been reduced by forty percent in light of the alleged misfeasance of Martinez.

■ First, with respect to the issue of whether the loss was fortuitous, the question of fortuity is a question of law for the court. We have plenary review on this question. *Compagnie des Bauxites v. In-*

surance Co. of N. Am., 724 F.2d 369, 371–72 (3d Cir.1983). Second, our review of the district court's determination of the date of the loss presents a legal question over which our review is also plenary. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 850 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Ortiz v. Eichler,* 794 F.2d 889, 891 (3d Cir.1986). Whether or not the district court erred in not submitting the issue of misrepresentation (in connection with the procurement of the endorsement) to the jury is likewise a legal question over which we have plenary review. Finally, the question of whether IMSA's recovery should be reduced by forty percent was decided by the district court as a question of equity law on the record before him. Our review of his findings of facts should be affirmed unless clearly erroneous. Fed.R.Civ.P. 52(a). We must determine, on the basis of these findings, whether the district judge abused his discretion in denying INA's motion to have the amount of the judgment reduced by forty percent.

## III.

The policy at issue is what is commonly known as an "all-risk" policy. Section VI of the policy states that INA insured covered equipment against "all risks of direct physical loss or damage from any external cause" except those causes specifically excluded.[8] In addition to the exclusions

---

App. at 1814 n. 7.

Following post-trial oral argument on the equitable defenses raised by INA, the district court entered an order rejecting those defenses (including INA's equitable defense of misrepresentation) and holding INA liable in accordance with the jury verdict. App. at 1842–44.

7. The endorsement was obtained on September 1, 1983, during the period between July 16, when the equipment was obtained pursuant to a lawful court order, and November 25, when IMSA, pursuant to a subsequent court order overruling the first court order, unsuccessfully tried to recover it. It states that "[i]t is understood and agreed that the items appeared [sic] on the attached list were moved from AHMSA location at [sic] Ter–Mexicana under the control of Raul [sic] Martinez IMS' partner in Mexico." App. at 1159hhhh.

8. We note that on this appeal, INA does not identify any policy exclusion that takes the loss outside the scope of coverage. However, in defending the case before the district court, INA focused on the following two exclusions:

k) loss or damage directly or indirectly caused by, or arising out of, or aggravated by war, invasion, act of foreign enemy, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, mutiny, military or usurped power, a group of malicious persons or persons acting on behalf of or in connection with any political organization, conspiracy, confiscation, commandeering, requisition or destruction or damage by order of any government de jure or de facto or by any public authority.

. . . .

n) loss or damage directly or indirectly caused by, or arising out of, or aggravated by

named in the policy itself, "every 'all-risk' contract of insurance contains an unnamed exclusion—the loss must be *fortuitous* in nature." Cozen & Bennett, *Fortuity: The Unnamed Exclusion*, XX Forum 222, 222 (Winter 1985) (emphasis in original). As a general rule, an "all-risk" policy:

> is to be considered as creating a special type of coverage extending to risks not usually covered under other insurance, and recovery under an "all-risk" policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.

13A Couch Cyclopedia of Insurance Law § 48:141, at 139 (1982) (footnote omitted). This Court has followed the general rule. *See, e.g., Peters Township School Dist. v. Hartford Accident & Indem.*, 833 F.2d 32, 37 (3d Cir.1987) ("all-risk" policies "afford coverage for all risks which are not excluded."); *Compagnie des Bauxites v. Insurance Co. of N. Am.*, 724 F.2d 369, 372 (3d Cir.1983) (such a policy requires "fortuitousness" of the risk.).

The term "all-risk" has been said to be "somewhat misleading." *See* Cozen & Bennett, *supra*, at 225 n. 19. "All-risk" is not synonymous with "all loss." *See Hampton Foods, Inc. v. Aetna Casualty & Sur. Co.*, 787 F.2d 349, 352 (8th Cir.1986); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 191 (D.Conn.1984) (stating that "[t]he label 'all

risk' is essentially a 'misnomer' " and that " '[a]ll risk' policies are not 'all loss' policies") (citations omitted). Indeed, the questions of "loss" and "risk" are separate and distinct. *See, e.g., Miller v. Boston Ins. Co.*, 420 Pa. 566, 218 A.2d 275 (1966) (in an all risk policy, the insured-plaintiff's prima facie case consists of showing that a loss was sustained and that the loss falls within the risks insured against).[9] First we turn to the question of whether a loss occurred on July 16, 1983.

## A. *The Question of Compensable Loss As Of July, 1983.*

INA argues on appeal that "[e]ven if loss was fortuitous here, there was no direct physical loss or damage to the eleven pieces of equipment seized by Martinez and Ter–Mexicana, at least prior to November of 1983." Appellant's Brief at 20. Both at trial and at the post-trial motion stage of the proceedings, the district court rejected INA's argument that there was no direct physical loss and instead found that "[t]here is no basis on the record for a finding that the loss of equipment was other than a permanent, total loss." App. at 1805.[10]

Under an "all-risk" policy, "the only questions which need be decided ... are whether [the plaintiff] has suffered a loss and, if so, whether such loss is excluded from coverage under the policy." *Plaza 61 v. North River Ins. Co.*, 446 F.Supp. 1168,

the wilful act or wilful negligence of the Insured or his representatives....

In the trial below, the district judge charged the jury as follows:

> The argument has been made that the taking of IMSA's equipment on July 16th, 1983, under a court order, comes under one or another of the provisions of exclusion "K." I have determined, as a matter of law, that this is not the kind of event exclusion "K" addresses. So I instruct you to disregard exclusion "K."
>
> Now, as to exclusion "N." Exclusion "N" of the policy provides that INA is not liable for "Loss or damage directly or indirectly caused by, or arising out of, or aggravated by the willful act or willful negligence of the insured or his representatives.... I instruct you that exclusion "N," like exclusion "K," is not applicable to the facts of this case.

App. at 1014–15.

In its order of June 29, 1988, the district judge ruled against INA on its motion for a new trial after INA argued that the district judge erred in instructing the jury that exclusions "K" and "N" have no application in this case. App. at 1820, 1823. INA has abandoned its reliance on these provisions for purposes of this appeal.

9. The district judge charged the jury that a loss had occurred on July 16, 1983. He then submitted to the jury in a special interrogatory the question of whether INA suffered an "unforeseen and sudden loss" to which the jury responded affirmatively. App. at 1789.

10. The contract of insurance provides:
    PERILS INSURED AGAINST:
    This policy insures against all risks of direct physical loss or damage from any external cause except hereinafter excluded.
    App. at 1159cc.

1170 (M.D.Pa.), *aff'd.*, 558 F.2d 822 (3d Cir.1978). INA argues that *Plaza 61* and *Young–Peterson Construction Inc. v. Potomac Ins. Co.*, 382 F.2d 400 (7th Cir.1967), *cert. denied*, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 980 (1968), hold that there is no compensable loss under an all-risk policy until a court of competent jurisdiction determines who may legally possess the property insured. Appellant's Brief at 24.[11] Thus, INA argues, no loss could have occurred until November 25, 1983. We disagree with this interpretation of the cited authorities. Whether or not Martinez and Ter–Mexicana took the equipment under a claim of right on July 16, 1983 is only relevant if the policy specifically provides that theft or other takings are excluded from coverage.[12] On this basis, *Plaza 61* and *Young–Peterson* are distinguishable. Naturally, when the insured's coverage is limited to "theft" as it was in *Plaza 61* and *Young–Peterson*, and the insurer shows that the dispossessor did not have the requisite intent, but instead acted under a claim of right, the insured's loss is not covered. Indeed, the question in *Young–Peterson* was whether the jury could have reasonably concluded that the taking was in good-faith so as to not be within the theft exclusion in the policy.[13] The actual disposition of the validity of the taking was held to be irrelevant. *See Young–Peterson*, 382 F.2d at 403.

Since INA conceded during oral argument that the policy contains no such specific exclusions which could exempt from coverage any loss which may have occurred on July 16, 1983, we hold that, based on the policy of construing all-risk policies broadly, a loss did occur on July 16, 1983. *See Compagnie des Bauxites*, 724 F.2d at 373 (stating that "a Pennsylvania court today would interpret the coverage of an all-risks policy broadly."). Further, policy terms must be given their plain and ordinary meanings where the language used is clear and unambiguous. *Pennsylvania Mfrs. Ass'n Ins. Co. v. Aetna Casualty & Sur. Co.*, 426 Pa. 453, 457, 233 A.2d 548, 551 (1967). The evidence is undisputed that IMSA lost possession and control over the insured equipment on July 16, 1983 and that it has not had possession or control of the equipment since that date. We find that such an absence of possession and control falls within the plain meaning of "loss." Because we agree with the district court that "the claim-of-right issue ... relates not to the existence of a 'direct physical loss,'" app. at 1806, but rather to the question of fortuity, we proceed to the question of whether the loss falls within the judicially-created "fortuity" exclusion from coverage. *See Compagnie des Bauxites*, 554 F.Supp. 1080, 1084 (W.D.Pa.1983) (stating that "the concept of a fortuitous event is a court imposed requirement of the law pertaining to contracts of insurance"),

11. In *Young–Peterson*, the plaintiff, Young–Peterson Construction, Inc. ("Young"), was the owner of four tractors and a trailer, and the vehicles were insured against "theft" by the defendant, Potomac Insurance Company ("Potomac"). The vehicles were removed from a storage yard in Illinois on April 24, 1959 by one Robert Holtman. Holtman proceeded to take the tractors and the trailer to Arizona and sell them. Young made an insurance claim, contending that it had suffered a "theft." Evidence demonstrated, however, Young had assigned title to the vehicles to Holtman as security for loans and advances to the company. Potomac therefore denied liability, arguing that Holtman's taking was accomplished in the exercise of a good faith claim of right to the vehicles in question. A jury found in favor of the defendant, Potomac, and the Seventh Circuit Court of Appeals affirmed.

12. We note that the record clearly indicates that this was not a normal contract of adhesion. Rather, there was substantial "give-and-take" in the drafting of the policy. The policy was in fact a typewritten, as opposed to a standard form, contract. App. at 742–43. The parties could have negotiated a specific exclusion to cover events such as those which transpired.

13. Also, in *Plaza 61*, the court determined that the loss was specifically excluded by paragraph 7(j) of the policy which exempted from coverage:

[l]oss or damage caused by or resulting from misappropriation, secretion, conversion, infidelity or any dishonest act by the Insured or other party in interest, his or their employees or agents, while working or otherwise, or any person or persons to whom the insured property may be entrusted[.]

446 F.Supp. at 1171.

*rev'd on other grounds,* 724 F.2d 369 (3d Cir.1983).

## B. *Fortuity Of The July 16, 1983 Loss.*

■ The jury found that IMSA had suffered an "unforeseen and sudden loss." App. at 1805. The district court, in reviewing INA's post-trial motions, found "[n]othing in defendant's presentation [which] warrants overruling that finding." *Id.* INA, in support of its motion for judgment notwithstanding the verdict, argued to the district court that IMSA's loss was not fortuitous as a matter of law, and therefore, falls within the judicially-created doctrine excluding non-fortuitous losses from all-risk insurance coverage.

We agree with INA's contention that the question of fortuity is a legal question for the court. *See, e.g., Compagnie des Bauxites,* 554 F.Supp. at 1082 (stating that "[t]he determination of whether a loss is fortuitous is a legal question for the court to determine."), *rev'd on other grounds,* 724 F.2d 369 (3d Cir.1983); *Redna Marine Corp. v. Poland,* 46 F.R.D. 81, 87 (S.D.N.Y. 1969) (stating that "the characterization of loss as 'fortuitous' is a legal conclusion to be distinguished from the facts upon which it is based."). *See also* Cozen & Bennett, *supra,* at 231 (stating that "fortuity ... is a question of law" and that the "application of the fortuity doctrine to the facts of a particular case is a question of law for resolution by the court."). In *Compagnie des Bauxites,* a diversity case applying Pennsylvania law, this Court found that the definition of a fortuitous event that Pennsylvania would adopt is that found in the Restatement of Contracts, namely:

> A fortuitous event ... is an event which *so far as the parties to the contract are aware,* is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, *provided that the fact is unknown to the parties.*

724 F.2d at 372 (quoting Restatement of Contracts § 291 comment a (1932)) (emphasis in original). We acknowledge that most courts which adhere to the above-cited definition of fortuity agree that the "burden of demonstrating fortuity is not a particularly onerous one," *Morrison Grain Co. v. Utica Mut. Ins. Co.,* 632 F.2d 424, 430 (5th Cir.1980); however, there is nothing fortuitous about the fact that a creditor such as Ter–Mexicana would resort to the courts to obtain collateral for unpaid debts. Nor is such a business dispute outside the parties' realm of control.[14] IMSA may have temporarily lost the use and enjoyment of its equipment, but only as a result of a proper order of the court which temporarily relieved IMSA of its possessory rights.[15] It is generally recognized that it is against public policy to allow insurance coverage on a certainty. *See* Cozen & Bennett, *supra,* at 233. In the context of a commercial debtor-creditor relationship, it is to be

---

**14.** One INA representative, Anne Di Pietro, was specifically asked whether a business dispute was within the realm of all-risk coverage. She responded that such matters are "completely outside the realm of insurance." App. at 758–59. She further testified that:

> There are different means of what we call risk transfer, and insurance is one of the ways to transfer risk that you don't want to accept.
> A business dispute in particular is something that is typically within the control of the insured, and so much so that there's not a possibility of having what we call a pure loss, which means that the likelihood of having a negative outcome is much more within the control of the insured than we would like it to be, and that presents for us what we feel moral hazard. Now, moral hazard is a very specific hazard or risk that we must assess. If

> there are certain things within the control of the insured, we want no parts of him.
> ، As I said before, this is so far out of the realm of property insurance, that it's never specifically addressed in any policy, any property policy.
> Q. And you mean a business dispute?
> A. A business dispute, yes, specifically addressed as a business dispute, yes.
> App. at 759.

**15.** Even the district court acknowledged that the July 15, 1983 order was a valid order when issued. The district judge stated:

> I further instruct you, however, that the July 15, 1983 court order was valid when it was issued. That is to say, that it had to be complied with until it was set aside by the Supreme Court of Justice [of Mexico].
> App. at 1010.

expected that parties may resort to the courts for resolution of disputes arising out of such relationships. Under the circumstances herein, the concept of risk that is inherent in all policies of insurance is lacking. App. at 759. Thus, we conclude that the taking of the equipment on July 16, 1983 as a result of a valid court order issued on the previous day is not a fortuitous event.

### C. *The November, 1983 Taking.*

■ The court order obtained by IMSA on November 25, 1983, which overruled the earlier court order of July 15, 1983, required Raoul Martinez and Ter–Mexicana to return the equipment to IMSA. Martinez and Ter–Mexicana had no legal right or justification to refuse to honor the November 25 order. General Counsel for IMS, Larry Meran, testified that when IMSA employees went to retrieve the equipment, some of the equipment "was found in a condition totally abandoned and with disinflated tires, disconnected cables and some parts such as batteries, solenoids, generators and motors in poor repair...." App. at 139. One such employee claimed that he was "verbally assaulted" by Rodolfo Martinez who was in charge of the place where the equipment was being kept. Meran testified that Rodolfo Martinez gave instructions to his subordinates "to impede at all cost the functioning and movement of the machinery," *id.*, and that, according to Meran, it was clear that "even with a valid legal order ruling in [his] favor that the equipment is to come back, [IMSA] still couldn't get the equipment, and [he] questioned how efficient the legal proceedings in Mexico would be for [IMSA]." App. at 141.

Ample authority exists for the proposition that such "all-risk" language (as that which exists in the present case) covers conversion. *See, e.g., Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,* 643 F.Supp. 1030, 1036 (S.D.N.Y.1986) (recognizing that a provision insuring "[a]gainst all risks of physical loss or damage from external cause ..." would provide coverage against conversion); *Great Northern Ins. Co. v. Dayco Corp.,* 620 F.Supp. 346, 350–51 (S.D.N.Y.1985) ("All Risks of Direct Physical loss" held to include theft by false pretenses). A conversion is the "deprivation of another's right of property in, or use and possession of, a chattel, without the owner's consent and without legal justification." *Welded Tube Co. of America v. Phoenix Steel Corp.,* 512 F.2d 342, 345 (3d Cir.1975). There was no theft or conversion on July 16, 1983 since the equipment was moved pursuant to a valid court order. However, we hold that a fortuitous loss did occur on November 25, 1983 as a result of the conversion of the equipment in the face of a valid court order. It is reasonable to expect that a valid court order will be obeyed. When parties fail to comply with a court order, in this case to return property pursuant to a valid court order—thereby converting such property—a fortuitous event has occurred.

### IV.

■ INA argues on appeal that because the district court held that the loss occurred on July 16, 1983, the jury never addressed INA's defenses of misrepresentation with respect to endorsements obtained after July 16, 1983. We agree. While the jury clearly addressed the question of whether there had been any material misrepresentations with respect to the *claim,* the jury did not address the question of whether misrepresentations had been made in the course of obtaining the *endorsements.* App. at 1840.[16] However,

16. INA contends that IMSA moved the equipment from AHMSA to Frontera without informing INA of this change in the risk and therefore did not give INA an opportunity to reassess the risk and decide whether to continue coverage.

On June 12, 1987, the jury returned answers to special interrogatories resulting in a verdict in favor of IMSA. With respect to INA's misrepresentation defense, the jury was presented with the following Special Interrogatories to which the jury answered in the negative:

4. Did IMSA make any material changes in the location of the insured equipment before July 16, 1983 of which INA was not informed before July 16, 1983?

5. Did IMSA, at any time after July 16, 1983, in connection with its claim, misrepresent to INA, or fail to disclose to INA, information

the district judge did address the question of whether misrepresentations had been made in the course of obtaining the endorsements during his consideration of INA's post-trial motions. Adjudicating pursuant to its equitable powers, the district court made the finding of fact that "the representations made in connection with the issuance of endorsement number 11 were not representations which can be characterized as being proved to be false by a standard of clear, precise and unequivocal proof." App. at 1839–40.

We find that the district court erred in making such a finding. INA is entitled to a jury determination on the question of misrepresentation. *See American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 327–28 (3d Cir.1985); *De Bellis v. United Benefit Life Ins. Co.*, 372 Pa. 207, 93 A.2d 429, 430 (1953) (stating that "[o]rdinarily the question of the truth or falsity of the answers and whether or not they were given by insured in good faith is for the jury.") (quoting *Evans v. Penn Mut. Life Ins. Co.*, 322 Pa. 547, 555, 557, 186 A. 133, 139 (1936).[17] Therefore, we will remand this issue for fact-finding by the jury.

## V.

INA argues that this verdict or any verdict on remand in favor of IMSA should be reduced by forty percent since IMSA's claim arises from the wrongful conduct of Raoul Martinez and since Ter–Mexicana is essentially the alter ego of Martinez. In addressing the claim, the district judge ruled as a matter of law and instructed the jury that "within the meaning of the policy, the relevant exclusion 'N,' in talking about insured, did not include Mr. Martinez, notwithstanding that he was a 40 percent

shareholder in IMSA, and did not include Martinez' company, TerMexicana." App. at 1843.[18] The district judge also rejected INA's argument that as a matter of Pennsylvania law, Martinez must be regarded as a co-insurer. App. at 1843. Instead, the district judge held Martinez to be a "third-party malefactor" whose interest is not "even close to the range of interests that would limit, let alone preclude altogether, recovery...." *Id.* No evidence of collusion was found between IMSA and Mr. Martinez or Ter–Mexicana, nor was there any indication in the record that Mr. Martinez or his company stood to gain from IMSA's recovery. Accordingly, we affirm this portion of the judgment.

## VI.

In summary, we hold that the district court erred in submitting the question of fortuity to the jury. As a matter of law, we hold that the July 16, 1983 taking under a valid court order was not a fortuitous event under the circumstances presented herein. Instead we find that it was not until November 25, 1983 that a fortuitous loss occurred. In addition, we find that the district court erred in not submitting the question of misrepresentation to the jury. Therefore, we will reverse and remand this portion of the judgment. Finally, we will affirm the district court's conclusion that any recovery by IMSA is not subject to a reduction due to the equity investment of Martinez.

Costs taxed against appellee.

about the condition and/or location of the equipment?
App. at 1815.

17. *See also* 19 Pennsylvania Law Encyclopedia § 524 at 457 (1959):
Fraud or Misrepresentation in General
If the evidence is in conflict as to whether an insured has been guilty of fraud or if an insurer's defense based on fraud depends upon the testimony of the insurer's witnesses, the case should be submitted to the jury, but,

if the fraud affirmatively appears from competent and uncontradicted documentary evidence, the court may determine the matter as a question of law.

18. The policy defines the "insured" as:
INSURED: International Mill Service, Inc., a subsidiary of IU International, and all subsidiary, associated, affiliated or allied companies.
App. at 1159dd.