

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-14-2002

# Port Auth NY NJ v. Affiliated FM Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 01-2513

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Port Auth NY NJ v. Affiliated FM Ins Co" (2002). *2002 Decisions.* Paper 730.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/730

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed November 14, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2513

PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
PORT AUTHORITY TRANS-HUDSON CORPORATION
(PATH); APPALACHIAN INSURANCE COMPANY

v.

AFFILIATED FM INSURANCE COMPANY, and all other
Defendants; ICAROM, P.L.C., as Successor in interest to
Insurance Corporation of Ireland (P.L.C.); AFFILIATE FM
INSURANCE COMPANY; ALLIANZ INSURANCE COMPANY,
as Successor in interest to Allianz Underwriters, Inc.;
ALLSTATE INSURANCE CO., as Successor in interest to
Northbrook Excess and Surplus Insurance Company;
AMERICAN CENTENNIAL INSURANCE COMPANY;
AMERICAN HOME ASSURANCE COMPANY; AMERICAN
MOTORISTS INSURANCE COMPANY; AMERICAN
PROTECTION INSURANCE COMPANY; APPALACHIAN
INSURANCE COMPANY; ARKWRIGHT MUTUAL
INSURANCE COMPANY, as Successor in interest to
Arkwright Boston Mfgrs. Mutual Insurance Company;
BIRMINGHAM FIRE INSURANCE COMPANY OF
PENNSYLVANIA; CALIFORNIA UNION INSURANCE
COMPANY; CITIBANK, N.A., as Trustee of Lloyd's
American Trust Fund; COLUMBIA CASUALTY COMPANY;
CONTINENTAL INSURANCE COMPANY; COVENANT
MUTUAL INSURANCE COMPANY; EMPLOYERS MUTUAL
CASUALTY COMPANY; FEDERAL INSURANCE COMPANY;
FIREMAN'S FUND INDEMNITY CORPORATION;
HARTFORD ACCIDENT & INDEMNITY COMPANY;
HARTFORD FIRE INSURANCE COMPANY; HOME
INDEMNITY COMPANY, THE; INSURANCE COMPANY OF

 NORTH AMERICA; INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA; LEXINGTON INSURANCE COMPANY;
LUMBERMENS MUTUAL CASUALTY COMPANY;
PENNSYLVANIA LUMBERMENS MUTUAL INSURANCE
COMPANY; PROVIDENCE WASHINGTON INSURANCE
COMPANY; RANGER INSURANCE COMPANY; TWIN CITY
FIRE INSURANCE COMPANY; UNITED STATES FIRE &
CASUALTY COMPANY; LONDON MARKET INSURERS
SUBSCRIBING TO LLOYDS POLICIES INCLUDING THE
FOLLOWING: ASSICURAZIONI GENERALI DI TRIESTE E
VENEZIA; BALTICA INSURANCE COMPANY, (U.K.) LTD.,
as Successor in interest to Baltica-Skandinavia Insurance
Company (U.K.) LTD.; BERMUDA FIRE & MARINE
INSURANCE COMPANY LIMITED; BRITISH NATIONAL
INSURANCE COMPANY, Individually and as Successor in
interest to North Atlantic Insurance Company and as
Successor in interest to British National Life Insurance
Society; BRYANSTON INSURANCE COMPANY LIMITED;

CNA REINSURANCE OF LONDON LIMITED; COMPAGNIE
D'ASSURANCES MARITIMES, AERIENNES ET
TERRESTRES, S.A. (C.A.M.A.T.I.); COMPAGNIE
EUROPEENNE D'ASSURANCES INDUSTRIELLES, S.A.; EL
PASO INSURANCE COMPANY LIMITED; ENGLISH AND
AMERICAN INSURANCE COMPANY; EXCESS INSURANCE
COMPANY LIMITED; FOLKSAM INTERNATIONAL
INSURANCE COMPANY LIMITED; INSCO LIMITED;
ICAROM, P.L.C., as Successor in interest to Insurance
Corporation of Ireland (P.L.C.); LLOYDS SYNDICATES
NUMBERED AS FOLLOWS, 2 (C.R. HILL), 4 (B.A.
STEWART), 15 (T.W. OBRIEN), 17 (P.N. CHRISTMAS), 28
(D.K.L. WHITE), 31 (M.F. BAIRD), 33 (I.N. THOMSON), 34
(T.K. HARDING), 40 (A.P. BARTLEET), 42 (P. HUNT), 53
(R.F. ELIOT), 50 (D.A. BEAUMONT), 51 (A. TAYLOR), 52
(P. HUNT), 56 (M.P. MANNING), 65 (P.D. MOREY), 67
(P.D. MOREY), 79 (J.R.L. YOUELL), 80 (S.G. THOMPSON),
87 (A.M. GORSUCH), 89 (M.E. BROCKBANK), 90 (E.A.
MOORE), 98 (B.F. BRUCE), 108 (S.R. FLETCHER), 109
(A.P. TARGETT), 123 (W.M. MICHELL), 127 (A.J.
ARCHER), 142 (D.T. POTTER), 144 (P.M. JOHNSON), 145
(J.R. CHARMAN), 162 (M.D. SEABY), 174 (B.G. BRUCE),

2

 176 (C.R. HILL), 179 (R.W.S. LARK), 180 (R.A.F.
MACMILLAN), 182 (A. TAYLOR), 183 (M. ASHLEY), 185
(A.M. GORSUCH), 187 (C.R. HILL), 190 (R.D. HAZELL),
191 (R.D. HAZELL), 202 (R.G. BENNETT), 203 (S.C.
WILMOT-SMITH), 204 (R.A. FIELD), 206 (M.J.H.
MAUGHAN), 207 (S.R.P. EDWARDS), 209 (B.G. ADAMS),
210 (A.G. LEE), 212 (R.J. MC CARTHY), 219 (C.H.A.
SICEY), 231 (J.M.H.P. WETHERELL), 232 (E. PIERI), 239
(S.I. COWLEY), 247 (D.A. POLLOCK), 250 (D.J. FLETT),
256 (G.M. WILLIAMS), 257 (K.R. SMITH), 264 (B.L.
EVENS), 269 (M.H. COCKELL), 275 (J.H. CHAPPELL), 282
(M.J. MARCHANT), 284 (M.J. MARCHANT), 288 (K.A.
LONG), 295 (M.E. SEABY), 299 (A.A. WILLARD), 303 (B.R.
BRANCH), 309 (J.B. HINGHAM), 317 (R.H.M.
OUTHWAITE), 321 (T.G. GREEN), 322 (R.D. ROBERTSON),
331 (R.H. GIBBS), 342 (R.J. BARRY), 358 (B.L. EVENS),
362 (R.J.R. KEELING), 363 (J.J.S. BIRRELL), 368 (A.D.
PILCHER), 375 (R.D. HAZELL), 381 (M.J. HARRIS), 384
(S.J. EDWARDS), 404 (R.A. LISSENDEN), 406 (S.I.
COWLEY), 411, 412 (A.D. PILCHER), 435 (D.P. MANN),
438 (T.R. ANSTEY), 441 (G.C.F. PALMER), 446 (D.A.
BEAUMONT), 447 (D.A. BEAUMONT), 448 (A.M.
ENGLAND), 457 (M.C. WATKINS), 469 (SIMMONDS), 471
(F.J. AUSTIN), 475 (R.J. BROMLEY), 483 (P.R.
CHANDLER), 484 (R.E. THOMSON), 488 (J.R. CHARMAN),
489 (J.R. CHARMAN), 498 (A.B.W. PHILLIPS), 500 (T.J.
PEPPER), 505 (A.J. ARCHER), 508 (J.R. PLANT), 510
(G.D. GILCHRIST), 512 (P.W. MURRAY), 522 (M.B. GRAY),
527 (L.C. TAYLOR), 529 (A.M.C. UNDERWOOD), 535 (G.
DAVIES), 540 (P.F. FAGAN), 544 (A.A. PITT), 545 (T.O.
PITRON), 552 (C.J. MANDER), 584 (C.W. HANKIN), 588
(M.E. BROCKBANK), 590 (R.F.DE L. WILLIS), 595 (C.D.D.
GILMOUR), 602 (D.H. FORREST), 604 (T.G. HALLOWAY),
609 (M.E. DENBY), 613 (M.J. BONDS), 620 (A.M.
ENGLAND), 623 (A.F. BEAZLEY), 635 (B. COLEMAN), 636
(J.D.P. BARNES), 640 (P.L. TOOMEY), 648 (B. COLEMAN),

653 (J.M.H.P. WETHERELL), 660 (J.L. DODSON), 662 (C.W. ROME), 672 (W.C. AGNEW), 685 (B.M. RODDICK),

3

694 (T.J. HAYDAY), 697 (A.E. BATHURST), 700 (J.R. CHARMAN), 701 (J.R. CHARMAN), 707 (J.K. SPICER), 722 (F.J. AUSTIN), 724 (S.A. HOLMES), 725 (T.J. KEMP), 727 (M.J. MEACOCK), 730 (E.A. MOORE), 735 (A.F. JACKSON), 741 (A.J. ARCHER), 744 (T.P. JOHNSON), 750 (A.C. ASHBY), 764 (N.P. COMPTON), 780 (B.F. CAUDLE), 782 (P.N. SLADE), 799 (R.A.G. JACKSON), 800 (J.A. WESTCOTT), 801 (J.H. DAVIES), 803 (G.W. HUTTON), 807 (R.F.H. WILSHAW), 812 (B.F. BRUCE), 823 (R.J.R. KNEELING), 829 (B.R. BRUCE), 836 (V.E. EMMES), 842 (B.F. BRUCE), 843 (S.G. THOMSON), 846 (A. TAYLOR), 850 (P.J. HUBERT), 855 (J.P.H. HARRISON), 860 (P.A. EDWARDS), 861 (M.E. BROCKBANK), 868 (A.J. ARCHER), 880 (M.E. BROCKBANK), 884 (R.W.S. LARK), 900 (B.F. BRUCE), 901 (H.W. GASCOINE), 904 (M.C. WATKINS), 908 (J.R. CHARMAN), 920 (G.C.F. PALMER), 923 (M.J. HARRIS), 926 (C.W. ROME), 927 (C.N. MACKINNON), 933 (J.R.L. YOUELL), 937 (J.R.L. YOUELL), 942 (A.J. AVERY), 947 (M.J. HARRIS), 950 (J.C. NEVITT), 960 (B.E. BEAGLEY), 972 (B.F. BRUCE), 984 (R.A. LISSENDEN), 987 (D.A. BEAUMONT), 990 (M.J. COX), 991 (M.J. COX), 994 (B.P.D. KELLETT), 1014 (G. MC CALL), 1023 (R.K. WEBB), 1027 (M. F. NEWTON); LIME STREET INSURANCE COMPANY, as Successor in interest to Louisville Insurance Company; LUDGATE INSURANCE COMPANY LIMITED; MUTUAL REINSURANCE COMPANY LIMITED; ORION INSURANCE COMPANY LIMITED; PEOPLES INSURANCE COMPANY OF CHINA; RIVER THAMES INSURANCE COMPANY LIMITED; SCANDINAVIAN REINSURANCE COMPANY LIMITED; SCOTTISH LION INSURANCE COMPANY; SIMCOE AND ERIE GENERAL INSURANCE COMPANY; SOCIETE DE REASSURANCES DES ASSURANCES MUTUELLES GRICOLES; SOREMA REINSURANCE COMPANY, as Successor in interest to Copenhagen Reinsurance Company (U.K.) Limited; ST. KATHERINE INSURANCE COMPANY; TERRA NOVA INSURANCE COMPANY LIMITED; TUREGUM INSURANCE COMPANY; UNIVERSAL REINSURANCE, as Successor in interest to Bellefonte Reinsurance Co.; WALBROOK INSURANCE COMPANY; "WINTERTHUR" SWISS INSURANCE COMPANY; YASUDA MARINE & FIRE INSURANCE COMPANY (U.K.) LIMITED; CERTAIN UNDERWRITERS AT LLOYD'S LONDON;

4

CERTAIN COMPANIES IN THE LONDON MARKET; COLERIDGE AND LONDON MARKET COMPANIES
(District Court No. 91-cv-02907)

APPALACHIAN INSURANCE COMPANY

v.

PORT AUTHORITY OF NEW YORK AND NEW JERSEY, formerly "THE PORT OF NEW YORK AUTHORITY"; PORT AUTHORITY TRANS-HUDSON CORPORATION;

(District Court No. 91-cv-01689)

Port Authority of New York and New Jersey; Port
Authority Trans-Hudson Corporation (PATH),
        Appellants

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Nos. 91-cv-01689 & 91-cv-02907)
District Judge: Honorable John W. Bissell

Argued September 9, 2002

Before: NYGAARD, ROTH, and WEIS, Circuit Judge s.

(Filed: November 14, 2002)

        Carlene V. McIntyre, Esquire
          (ARGUED)
        Hugh H. Welsh, Esquire
        Milton H. Pachter, Esquire
        Michael D. Driscoll, Esquire
        Shirley J. Goldstein, Esquire
        Ezra I. Bialik, Esquire
        Dolores J. Ostaszewski, Esquire
        Law Department
        The Port Authority Of New York and
         New Jersey
        One Madison Avenue, 7th floor
        New York, NY 10010

        Attorneys for Appellants

        Kenneth W. Erickson, Esquire
          (ARGUED)
        Matthew M. Burke, Esquire
        Jane E. Willis, Esquire
        David M. Stringer, Esquire
        Ropes & Gray
        One International Place
        Boston, Massachusetts 02110-2624

        Attorneys for Appellees,
        Coleridge and London Market
        Companies, Icarom, P.L.C., Lexington
        Insurance Company, Baltica
        Insurance Company, CNA
        Reinsurance of London Limited,
        Compagnie D'Assurances Maritimes
        Aeriennes Et Terrestres, S.A.,
        Compagnie Europeenne D'Assurances
        Industrielles S.A., Excess Insurance
        Company Limited, Folksam
        International Insurance Company
        Limited, Insco Limited, River Thames
        Insurance Company Limited, Scottish
        Lion Insurance Company, Simcoe and
        Erie General Insurance Company, St.

Katherine Insurance Company, Terra
Nova Insurance Company Limited,
Turegum Insurance Company,
"Winterthur" Swiss Insurance
Company, Yasuda Fire & Marine
Insurance Company, Certain London
Market Companies and Assicurazioni
Generali, S.p.A.

Gregory R. Haworth, Esquire
Duane, Morris LLP
744 Broad Street, Suite 1200
Newark, New Jersey 07102-3389

Attorneys for Appellee,
Coleridge and London Market
Companies

6

Matthew S. Ponzi, Esquire
Thomas B. Orlando, Esquire
Foran Glennon Palandech & Ponzi
150 South Wacker Drive, 11th Floor
Chicago, IL 60606

Attorneys for Appellee,
United Fire & Casualty Company

Richard M. Mackowsky, Esquire
Michael R. McCarty, Esquire
Cozen & O'Connor
1900 Market Street
The Atrium
Philadelphia, PA 19103

Andrew S. Amer, Esquire
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

Attorneys for Appellees,
Hartford Fire Insurance Company
and Hartford Accident & Indemnity
Company

Stuart Cotton, Esquire
Jeffrey S. Weinstein, Esquire
Mound, Cotton, Wollan &
 Greengrass
One Battery Park Plaza, 9th Floor
New York, NY 10004

Attorneys for Appellees,
American Home Assurance Company,
Birmingham Fire Insurance Company
of Pennsylvania, Insurance Company
of the State of Pennsylvania,
Lexington Insurance Company and
Providence Washington Insurance
Company

H. Richard Chattman, Esquire
Podvey, Sachs, Meanor, Catenacci,
 Hildner & Cocoziello
One Riverfront Plaza
The Legal Center, 8th Floor
Newark, NJ 07102

Attorney for Appellee,
Affiliated FM Insurance Company

Peter E. Kanaris, Esquire
Lawrence D. Mason, Esq.
Daar, Fisher, Kanaris & Vanek
200 South Wacker Drive, 33rd Floor
Chicago, IL 60606

Attorneys for Appellees,
Allianz Insurance Company,
Continental Insurance Company,
Employers Mutual Casualty
Company, Federal Insurance
Company and Home Indemnity
Company

Jerrald H. Hochman, Esquire
Siegal & Napierkowski
220 Lake Drive East, Suite 304
Cherry Hill, NJ 08002

Attorney for Appellee,
Insurance Company of North America

OPINION OF THE COURT

WEIS, Circuit Judge.

The District Court held that unless asbestos in a building was of such quantity and condition as to make the structure unusable, the expense of correcting the situation was not within the scope of a first party insurance policy covering "physical loss or damage." We agree and will affirm.

Plaintiffs, the Port Authority of New York and New Jersey and its subsidiary, the Port Authority Trans-Hudson

Corporation, own numerous facilities in New York and New Jersey that incorporated asbestos products in their construction. Alleging asbestos contamination, plaintiffs filed suit for damages in the New Jersey state courts against the defendants, a number of insurance companies that had first-party policies on the various structures. The case was removed to the United States District Court for the District of New Jersey.

Plaintiffs seek recovery for expenses incurred in conjunction with the abatement of asbestos-containing

materials in their structures such as the World Trade Center complex in New York and Newark International Airport in New Jersey. The plaintiffs contend that physical damage has occurred in these structures as a result of the "presence of asbestos," "threat of release and reintrainment of asbestos fibers," and the "actual release and reintrainment of asbestos fibers."

To support their claims, plaintiffs point to the existence of friable asbestos in some of their buildings. Once an asbestos product reaches the friability stage, it may be crumbled by vibrations or hand pressure and it continues to deteriorate into separate fibers. In this condition, the asbestos becomes more susceptible to dispersion in the air and poses an increased risk to human health. Plaintiffs cite this as a documented problem at Newark Airport, where insulation had to be removed from pipes around the heating and ventilating units. In other locations, asbestos fibers were actually released during the performance of routine building functions, the renovation of existing structures, and demolition projects.

In the mid-1980s, the plaintiffs undertook a renovation program to remove asbestos products from portions of the World Trade Center. Pursuant to OSHA regulations, plaintiffs augmented their abatement policy by conducting regular surveys of asbestos-containing materials and employing air monitoring procedures. During these activities, maintenance and construction workers were subjected to stringent safety requirements, including mandatory protective clothing and equipment. However, air samples taken in each location did not reveal the presence of asbestos fibers exceeding EPA standards.

9

 Even after the World Trade Center was severely damaged by a truck bomb in 1993, extensive air sampling tests indicated that, except for the occasional "spikes of higher levels," the existing conditions were not problematic. Relying on these tests, plaintiffs continually assured their employees, as well as current and prospective tenants, that the buildings were safe and within regulatory limits.

The Port Authority's policy on the asbestos present was to "manage [it] in place and to abate it only when required." The record in the District Court established that none of the plaintiffs' structures violated applicable regulations, and asbestos levels inside the buildings were comparable to background levels on the streets. In the more than 1,000 locations alleged to contain asbestos or an imminent threat of its release, plaintiffs assert claims for 69 abatement projects, which the record shows had been carried out in only 13 instances. During this time, all of plaintiffs' structures continued in normal use.

Plaintiffs made claims against the defendants under their first-party insurance policies which contained one of the following statements of the perils within their scope of the policies:

"ALL RISKS of physical loss or damage occurring during the period of this policy including loss of revenue and business interruption, are insured against, except as otherwise specifically excluded.

ALL RISKS of physical loss or damage occurring during the period of this policy including loss of revenue . . . are insured against, except as otherwise specifically excluded.

ALL RISKS of direct physical loss or damage occurring during the period of this policy including loss of revenue . . . are insured against, except as otherwise specifically excluded."

The policies define "loss occurrence" as a "loss or combination of losses caused by all risks of physical loss or damage subject to the perils excluded arising out of one single event. . . . or a loss by any peril or combination of perils insured against arising out of a single event." The

10

periods covered in the policies were from 1971 to 1991. Unlike usual contracts of adhesion, the manuscript policies issued by the defendants were drafted by plaintiffs with the aid of counsel and insurance professionals, and, in some respects, negotiated with the underwriters.

In view of the number of claims and complexity of the case, the District Court divided the litigation into three stages. The first was limited to such preliminary determinations as timeliness of notice and suit limitations in various policies. Some of the defendants were dismissed at the conclusion of this initial phase and no appeal has been taken from those rulings.

The second stage of the litigation was to "encompass all issues relating to whether, and if so, to what extent, physical loss or damage happened at a time for which an insurer is responsible under a policy." In order to simplify the proceedings, and at the suggestion of the parties, the Court designated six buildings of the World Trade Center and nine at Newark International Airport as test structures. The third stage was to have been devoted to determining the monetary loss. Because the District Court entered summary judgment in favor of all defendants, however, it did not reach the third stage.

The District Court framed the issue as whether coverage was "triggered in the first instance, without regard to language excluding certain risks of loss." Finding that the language of the policies was unambiguous, the Court determined that the only question that needed to be decided was whether the insured had suffered "physical loss or damage."

The plaintiffs have the burden to establish that their structures were, in fact, physically damaged in order to trigger coverage. See, Koppers Co. v. Aetna Cas. & Surety Co., 98 F.3d 1440, 1446 (3rd Cir. 1996); Cobra Products

Inc. v. Federal Ins. Co., 722 A.2d 545, 549 (N.J. Super. Ct. App. Div. 1998). In resolving the issues before it, the Court concluded that "it is important to differentiate between the authorities generated by [first-party and third-party] coverage." Where, in the District Court's opinion, "the central issue is a fundamental one delimiting the scope of

coverage under a first party insuring agreement. . .. . [t]here is more than adequate justification to seek guidance only from first party precedent."

Acknowledging that no controlling case on point existed, the Court reasoned that "physical loss or damage" could be found only if an imminent threat of asbestos release existed, or actual release of asbestos resulted in contamination of the property so as to nearly eliminate or destroy its function, or render it uninhabitable. The mere presence of asbestos, on the other hand, was not enough to trigger coverage.

The Court determined that the plaintiffs had failed to introduce evidence of "physical loss or damage" sufficient to survive summary judgment. Notably, the Court observed that "a significant portion of the [plaintiffs'] claimed losses arise from the presence of asbestos, unaccompanied by even the suggestion of actual release or imminent threat of release of asbestos fibers." Of the plaintiffs' locations where proof of release was shown, the Court noted that the continued and uninterrupted use of the buildings without any indication of elevated airborne asbestos level, coupled with the plaintiffs' own assurances of public safety, "belie the existence of contamination to the extent required to constitute physical loss or damage." Finally, the Court concluded that the plaintiffs cannot create a material issue "based on imminent threat of release of asbestos manifested during the years 1978 to 1991 if it has failed to abate the purported threat to date."

The Port Authority has appealed, asserting that the District Court adopted an incorrect standard for"physical loss" and misconstrued first-party and third-party insurance case law. Moreover, the plaintiffs argue that they produced ample proof that there was physical loss or damage attributable to asbestos in the insured properties. The defendants contend that plaintiffs failed to show physical loss or damage to its buildings and that the District Court correctly relied on first-party insurance law and principles rather than third-party coverage standards.

In reviewing the grant of summary judgment, we must affirm if the record evidence submitted by the non-movant

"is merely colorable or is not significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The non-movant "may not rest upon mere allegations, general denials, or . . . vague statements." Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991). When opposing a motion for summary judgment, the party

bearing the burden of persuasion in the litigation is obligated "to identify those facts of record which would contradict the facts identified by the movant." Childers v. Joseph, 842 F.2d 689, 694-95 (3d Cir. 1988).

The case before us presents issues of state law. Because the plaintiffs' properties lie in both New York and New Jersey, the law of either state could be applicable to various structures. However, there appears to be no substantive difference in the law of the two states and the parties do not advance conflict of laws issues.

The fundamental differences between liability policies and first-party contracts make the multitude of appellate court opinions in third-party asbestos personal injury suits unhelpful in resolving the issues presented in this case. The primary aim of third-party insurance is to defend and indemnify insureds against liability for claims made against them as a result of their own conduct. First-party coverage, on the other hand, protects against loss caused by injury to the insured's own property. Wholly different interests are protected by the two distinct forms of coverage.

Moreover, the parties to each form of insurance contract assume vastly different roles. In the third-party setting, the insurer and insured may generally be considered allies, but in the first-party context, the insured and carrier are placed in an adversarial position. We are persuaded that the time-honored distinction between the two types of insurance coverage is valid and should be maintained. See Great Northern Ins. Co. v. Mt. Vernon Fire Ins. Co., 708 N.E.2d 167, 170 (N.Y. 1999); Winding Hills Condo Ass'n. v. North American Specialty Ins. Co., 752 A.2d 837, 840 (N.J. Super. Ct. App. Div. 2000).

New Jersey courts, along with many others, have explicitly recognized this differentiation when defining the scope of coverage under an insuring agreement. Third-party

13

coverage is routinely determined by the "continuous trigger" standard, meaning that a loss occurs continuously from occurrences of the incident causing the damage to its manifestation. This outcome is justified by the"law's solicitousness for victims of mass toxic torts . . . and is entirely consistent with choosing that conceptually viable trigger theory affording the greatest ultimate redress." Winding Hills, 752 A.2d at 840.

That justification and outcome do not, however, transfer to the first-party setting. In that context, the"manifest trigger" provides the appropriate standard by which to measure the occurrence of a loss, that is, that the loss occurs only in the policy period in which it is revealed. "Public rights" are of less relevance and the ability of the insured to assure his protection by obtaining full coverage each policy year mandates adherence to the stricter rule. Winding Hills, 752 A.2d at 840.

Because this distinction carries over to framing the

definition of property damage, the difference between first and third-party insurance affects a court's interpretation of the policy language. Unlike liability policies, where the public interest in compensation for injured third-parties is a strong factor, in a first-party policy, the extent to which insured persons may protect themselves is a matter that rests in their own determination and judgment. As a result, the relationship between the insurer and insured and the incidence of property damage in first-party matters are generally determined by reliance on traditional contract principles.

This approach is particularly important when construing first-party, 'all risks' policies. Under such policies, the insurer agrees to pay for all fortuitous losses that are not excluded under the contract. It is worthy of note, though, that in the insurance industry, "all risks" does not mean "every risk." As Judge Friendly remarked in Aetna Casualty Ins. & Surety Co. v. Yates, 344 F.2d 939, 940 (5th Cir. 1965), "[t]he description of the policy as 'All Risks' is rather a misnomer since it contains fourteen lettered exclusions . . . ." Accord, Intermetal Mexicana S.A. v. Insurance Co. of North America, 866 F.2d 71, 75 (3d Cir. 1989). Moreover, "[a] loss which does not properly fall within the coverage

14

clause cannot be regarded as covered thereby merely because it is not within any of the specific exceptions. . . ." 10 Couch on Insurance   148:48 (3d ed. 1998). Consequently, the responsibility under a first-party 'all risks' policy must be determined by the terms and conditions of the contract.

The scarcity of case law addressing asbestos contamination under first-party insurance contracts extends to both New York and New Jersey jurisprudence. Counsel for both parties have diligently searched for helpful precedents. However, after examining their results and conducting our independent analysis, we are left with a few cases from other states, including a number of reported trial court opinions which, of course, have no precedential standing. Most of the appellate court opinions discussing insurance and asbestos speak to general liability policies which, we conclude, are inapplicable to first-party policies. See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178 (2d Cir. 1995); United States Fid. & Guar. Co. v. Wilkins Insulation Co., 578 N.E.2d 926 (Ill. 1991).

Plaintiffs have cited two first-party appellate decisions referring to asbestos contamination of an apartment building, Sentinel Mgmt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296 (Minn. Ct. App. 1997) and in a later stage of that same litigation, Sentinel Mng. Co. v. Aetna Cas. & Surety Co., 615 N.W.2d 819 (Minn. 2000). In those cases, plaintiffs sought recovery under their first-party 'all risks' policy "not for the mere presence of [asbestos containing materials] in the buildings, but for the release of asbestos fibers and resultant contamination." Sentinel , 563 N.W.2d at 300.

The Sentinel Courts concluded that asbestos contamination can constitute a direct, physical and fortuitous loss under an "all-risks" first-party insurance policy. In order to meet this standard, plaintiffs had to prove not only the presence of asbestos, but that the contamination presented a health hazard to the building's tenants and as such seriously impaired the building's function. Sentinel, 615 N.W.2d at 826. Although the buildings in question remained occupied without significant abatement activity, the proof of actual release of asbestos

fibers on carpeting and other surfaces was considered to be enough to trigger the insurance coverage.

Plaintiffs also rely on Board of Educ. v. Int'l. Ins. Co., 720 N.E.2d 622 (Ill. App. Ct. 1999). That case permitted recovery for the removal of friable asbestos from a school building under a first-party insurance policy. However, that court's rationale is considerably weakened by its reliance on the definition of physical loss in United States Fid. & Guar. Co. v. Wilkin Insulation Co., 578 N.E.2d 926 (Ill. 1991), an insulation case involving a general liability policy and not first-party coverage.

Defendants call our attention to Leafland Group II v. Insurance Co. of North America, 881 P.2d. 26 (N.M. 1994). In that first-party policy dispute, the insured claimed loss of value of an apartment complex caused by the presence of asbestos containing materials. These components, however, were in the buildings when they were purchased by the insured. In denying recovery, the New Mexico Supreme Court noted that no incident or occurrence during the time the policy was in effect caused direct loss or damage to the structures. The Court commented that" 'all risks' first-party insurance coverage . . . does not protect against losses that are certain to happen." Leafland, 881 P.2d at 28.

Defendants also cite Pirie v. Federal Ins. Co. , 696 N.E.2d 553 (Mass. App. Ct. 1998), where plaintiffs sought first-party coverage for lead paint removal. The Court concluded that an internal defect in a building does not amount to an actual physical loss, and, as a result, the costs associated with eliminating lead paint from the house were not covered. In reaching this decision, the court cited similar results in asbestos cases. See, e.g., Great Northern Ins. Co. v. Benjamin Franklin Sav. & Loan Ass'n, 793 F. Supp. 259 (D. Or. 1990), aff 'd, 953 F.2d 1387 (9th Cir. 1992).

We thus find ourselves with a diversity case in which applicable state law provides no guidance and the parties rely on appellate decisions from jurisdictions having no relationship with the entities involved in this dispute. Our task is, therefore, one of prediction of what may eventually become the law of the states that are most concerned with the subject matter.

A court must interpret the language of an insurance

policy according to its plain and ordinary meaning.
Ambrosio v. Affordable Auto Rental, Inc., 704 A.2d 572, 575
(N.J. Super. App. Div. 1998); Intermetal Mexicana, 866 F.2d
at 76. Although New Jersey Courts generally read policies
in favor of the insured, they "should not write for the
insured a better policy . . . than the one purchased."
Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 562 A.2d
208, 214 (N.J. 1989). One of the frequently cited reasons
for interpreting language in favor of the insured is that
insurance policies are generally contracts of adhesion,
which offer little choice to the purchaser. This justification,
though, has little application in this case. As is often the
situation with large, knowledgeable business firms, the
contracts were manuscript policies negotiated and drafted
by the insured. See Fenwick Mach, Inc. v. A. Tomae & Sons,
Inc. 401 A.2d 1087 (N.J. 1979).

In ordinary parlance and widely accepted definition,
physical damage to property means "a distinct,
demonstrable, and physical alteration" of its structure. 10
Couch on Insurance  148:46 (3d ed. 1998). Fire, water,
smoke and impact from another object are typical examples
of physical damage from an outside source that may
demonstrably alter the components of a building and
trigger coverage. Physical damage to a building as an entity
by sources unnoticeable to the naked eye must meet a
higher threshold. The Colorado Supreme Court in Western
Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52 (Co.
1968), concluded that coverage was triggered when
authorities ordered a building closed after gasoline fumes
seeped into a building's structure and made its use unsafe.
Although neither the building nor its elements were
demonstrably altered, its function was eliminated.

In the case before us, the policies cover "physical loss,"
as well as damage. When the presence of large quantities of
asbestos in the air of a building is such as to make the
structure uninhabitable and unusable, then there has been
a distinct loss to its owner. However, if asbestos is present
in components of a structure, but is not in such form or
quantity as to make the building unusable, the owner has
not suffered a loss.1 The structure continues to function --

_____

1. It is conceivable that asbestos contamination could make one
apartment in a complex uninhabitable but not affect the other units.

17

 it has not lost its utility. The fact that the owner may
choose to seal the asbestos or replace it with some other
substance as part of routine maintenance does not bring
the expense within first-party coverage.

The District Court concluded that "physical loss or
damage" occurs only if an actual release of asbestos fibers
from asbestos-containing materials has resulted in
contamination of the property such that its function is
nearly eliminated or destroyed, or the structure is made
useless or uninhabitable, or if there exists an imminent
threat of the release of a quantity of asbestos fibers that

would cause such loss of utility. The mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage.

We agree with the District Court's articulation of the proper standard for "physical loss or damage" to a structure caused by asbestos contamination. The requirement that the contamination reach such a level in order to come within coverage limitation establishes a reasonable and realistic standard for identifying physical loss or damage. The effect of asbestos fibers in such quantity is comparable to that of fire, water or smoke on a structure's use and function. A less demanding standard would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building. This outcome that would not comport with the intent of first-party 'all risks' insurance policy, but would transform it into a maintenance contract. See 80 Broad St. Co. v. U.S. Fire Ins. Co., 389 N.Y.S.2d 214 (N.Y. Sup. Ct. 1975), aff 'd, 54 A.2d 888 (N.Y. App. Div. 1st Dep't. 1976).

We thus find ourselves in agreement with the District Court's ruling that plaintiffs' inability "to produce evidence concerning the manifestation of an imminent threat of asbestos contamination" forecloses the existence of a viable

---

There would be a loss in that instance, as there would be if one apartment had been damaged by fire leaving the others untouched. However, that situation is not presented in the case before us.

18

 claim. Although the plaintiffs demonstrated that many of its structures used asbestos-containing substances, those buildings had continuous and uninterrupted usage for many years. The mere presence of asbestos or the general threat of its future release is not enough to survive summary judgment or to show a physical loss or damage to trigger coverage under a first-party 'all risks' policy.

Accordingly, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

19